IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


DUANE JARRELL,

        Plaintiff,

vs.                                             CASE NO. 1:10-cv-137-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/


## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") terminating his disability insurance benefits due to medical improvement. (Doc. 1.) The Commissioner has answered (Doc. 12), and both parties have filed briefs outlining their respective positions. (Docs. 17 and 20.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act (the "Act") on October 18, 1985, alleging a disability onset date of November 14, 1984. (R. 50-53.) On January 7, 1986, Plaintiff was awarded benefits with an onset date of November 14, 1984 because the Commissioner concluded Plaintiff met the requirements of Listing 12.04 for depressive syndrome. (R. 54.)

Plaintiff's benefits were continued after disability reviews conducted in November 1989 and January 1990.  (R. 65-82.)  Another continuing disability review was conducted in July 1997. At this disability review the Commissioner found that Plaintiff's disability ceased on July 1, 1997 and his benefits ended on September 30, 1997 due to medical improvement related to his ability to work.  (R. 83-85.)  Plaintiff filed a request for reconsideration on January 6, 1998, which was denied.  (R. 89.)  Plaintiff then appealed the cessation determination, which was affirmed on December 17, 1998 after a disability hearing before a disability hearing officer, which Plaintiff did not attend.  (R. 101-12.)

On February 17, 1999 Plaintiff requested review by an Administrative Law Judge ("ALJ") of the hearing officer's decision. (R. 32-33, 116-19.)  A hearing was held before ALJ Apolo Garcia on June 9, 1999.  On August 16, 1999, ALJ Garcia issued an unfavorable decision finding Plaintiff's disability had ceased July 1, 1997.  (R. 12-21.) On August 31, 1999 Plaintiff requested the Appeals Council to review ALJ Garcia's decision. The request was denied by the Appeals Council on February 8, 2000.  (R. 3-4, 7-8.)

Plaintiff then sought review of ALJ Garcia's decision in the United States District Court for the Middle District of Florida. (M.D.Fla. Case No. 5:00-cv-134-10-GRJ, Doc. 1.)  In the Middle District of Florida case the Commissioner requested the Court to remand the case for further proceedings. On April 18, 2001, the Commissioner's request for remand was granted and the case was remanded to the Commissioner under Sentence Four of 42 U.S.C. § 405(g) with directions that the Commissioner identify the Plaintiff's severe impairments, state the functional limitations of each of

Plaintiff's severe impairments and evaluate the functional consequences of Plaintiff's severe impairments. (M.D.Fla. No. 5:00-cv-134-10-GRJ, Docs. 11 and 13; R. 343-44.) On November 15, 2001, the Appeals Council remanded the case to an ALJ with instructions to conduct proceedings consistent with the court's order in M.D.Fla. Case No. 5:00-cv-134-10-GRJ.  (R. 347-48.)

On May 20, 2002, a supplemental hearing was held before ALJ Garcia, who on July 8, 2002 rendered a decision again concluding Plaintiff's disability had ceased July 1, 1997.  (R. 402-18.)  On July 25, 2002 Plaintiff filed a request for Appeals Council review of ALJ Garcia's second decision.  (R. 423-24.)  The Appeals Council remanded ALJ Garcia's second decision on November 5, 2003 for an ALJ (other than ALJ Garcia) to further evaluate Plaintiff's mental impairments, give further consideration to the Plaintiff's residual functional capacity, obtain evidence from a medical expert to clarify the nature and severity of the Plaintiff's mental impairments and, if warranted, obtain testimony from a vocational expert.  (R. 427-29.)

Plaintiff's second supplemental hearing was held on July 15, 2004 and on October 27, 2004 ALJ Philemina M. Jones issued an unfavorable decision finding Plaintiff's disability had ceased July 1, 1997.  (R. 453-70.)  Plaintiff requested review of ALJ Jones' October 27, 2004 decision.  (R. 530-31.)  On August 29, 2007 the Appeals Council remanded the case with instructions to the ALJ to obtain evidence from a vocational expert and identify any conflicts between the testimony of the vocational expert and the DICTIONARY OF OCCUPATIONAL TITLES.  (*Id.*)

Plaintiff's third supplemental hearing was held via video-conference on June 17, 2008.  On September 18, 2008 ALJ Jones issued a written decision, her second in this

3

case, in which she determined Plaintiff's eligibility for benefits ceased July 1, 1997.  (R. 324-39.)  Plaintiff requested review of ALJ Jones's second decision by the Appeals Council and the Appeals Council denied Plaintiff's request for review on May 11, 2010. (R. 294-96, 320.)  Plaintiff then filed his Complaint in this case on July 12, 2010.  (Doc. 1.)

Although not before this Court for review, Plaintiff also protectively filed subsequent applications for disability insurance benefits under Title II of the Act and Supplemental Security Income ("SSI") benefits under Title XVI of the Act on May 24, 2001, alleging a disability onset date of August 16, 1999.  (R. 325-26.)  Those claims were denied initially and upon reconsideration on January 11, 2002.  (R. 325-36). There is no indication in the record that a request for hearing was filed on either of those subsequent claims.

After that Plaintiff then protectively filed a second application for SSI benefits on November 30, 2002.  (R. 326.)  On this application the Commissioner determined that Plaintiff was eligible for SSI beginning on November 1, 2002 because the Commissioner concluded that during the time frame of that application Plaintiff met the requirements of Listing 12.04.  (*Id.*)

Accordingly, this Court's review is limited to the discrete period of time addressed in ALJ Jones's second written decision dated September 18, 2008, in which she concluded Plaintiff's disability ceased effective July 1, 1997.

## II. <u>CONTINUING DISABILITY STANDARD OF REVIEW</u>

This case does not involve the review of an initial application for disability

4

benefits, but rather a review of Plaintiff's continuing disability in order to determine if he remained eligible to receive benefits during a finite period of time. In determining whether a claimant's disability continues or ends, the Commissioner must determine whether there has been any medical improvement in the claimant's impairment(s) and, if so, whether the medical improvement is related to the claimant's ability to work.[1]  In determining whether medical improvement has occurred the Commissioner will compare the medical severity of the Plaintiff's impairment(s) at the time of the decision to continue or discontinue benefits to the medical severity of the impairment(s) when benefits were awarded.[2]

Medical improvement is defined as any decrease in the medical severity of the claimant's impairment(s) that was present at the time of the most recent favorable medical decision that the claimant was disabled.[3]  This most recent favorable medical decision that the claimant was disabled is known as the comparison point decision ("CPD").[4]  A finding of a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with the claimant's impairment(s).[5]  Symptoms are the claimant's description of the impairment(s).[6]  Signs

---

[1] 20 C.F.R. § 404.1594(a). The definitions and evaluation process governing disability determinations for disability insurance benefits under Title II of the Social Security Act are identical to those governing benefits under supplemental security income, Title XVI of the Act. *See* 20 C.F.R. § 416.101, *et seq.*

[2] 20 C.F.R. § 404.1594(b)(7).

[3] 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(I).

[4] 20 C.F.R. § 404.1594(b)(7).

[5] *Id.*

[6] 20 C.F.R. §§ 416.928(a), 404.1528(a).

are abnormalities which can be observed and must be shown by medically acceptable clinical diagnostic techniques.[7]  Laboratory findings are findings produced by medically acceptable laboratory techniques.[8]  Medical improvement is related to the claimant's ability to do work if there has been a decrease in the severity of the impairment(s) present at the time of the most recent favorable medical decision that the claimant was disabled and an increase in the claimant's functional capacity to do basic work activities.[9]  Section 404.1594(f) of the Code of Federal Regulations outlines the evaluation steps to be taken in reviewing whether a claimant's disability continues. These steps are:

> (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant's disability status will cease.
>
> (2) If no, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 [of the regulations]?
>
> (3) If no, has there been medical improvement in the claimant's condition?  If yes, proceed to Step 4.  If no, the claimant's disability continues.
>
> (4) Is the medical improvement in the claimant's condition related to his ability to work?  If no, proceed to Step 5.  If yes, proceed to Step 6.
>
> (5) If the medical improvement in the claimant's condition is not related to his ability to work, do any of the exceptions[10] listed apply?  If no, the claimant's

---

[7] 20 C.F.R. §§ 416.928(b), 404.1528(b).

[8] 20 C.F.R. §§ 416.928(c), 404.1528(c).

[9] 20 C.F.R. § 404.1594(b)(3).

[10] If a claimant meets any of the following exceptions, even if medical improvement has not occurred, the individual can still be found capable of substantial gainful activity if:
> (1) The claimant was the beneficiary of advances in medical or vocational therapy or technology (related to the claimant's ability to work).
> (2) The claimant has undergone vocational therapy related to his or her ability to work.
> (3) Based on new or improved diagnostic or evaluative techniques, claimant's

disability continues.

(6) If the medical improvement is found to be related to the claimant's ability to work, the Commissioner will determine whether all of the claimant's current impairments, in combination, are severe.

(7) If these impairments are severe, the Commissioner will assess the claimant's residual functional capacity to determine whether the claimant can perform his past relevant work.  If the Commissioner determines that the claimant can perform his past relevant work, his disability status will cease.

(8) If the claimant can no longer perform his past relevant work, the Commissioner will assess whether the claimant can do other work considering the claimant's residual functional capacity, age, education and past work experience.  If he can, his disability status will cease.

In the case of a determination as to continuing disability, the court must review the Commissioner's final decision in terms of both the eight-step analysis outlined above and the general substantial evidence standard of review.  Therefore, the appropriate inquiry is "whether the [Commissioner]'s finding of improvement to the point of no disability is supported by substantial evidence."[11]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[12]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as

---

impairment(s) is/are not as disabling as was thought at the time of the most recent favorable decision.
(4) Substantial evidence demonstrates that any prior disability decision was in error.

[11] Simpson v. Schweiker, 691 F.2d 966, 969 (11th Cir. 1982); see also 42 U.S.C. § 405(g).

[12] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995)(citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401 (1971))); accord Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[13]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[14] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[15]

### III.  SUMMARY OF THE RECORD

The Plaintiff's challenge to the Commissioner's decision focuses upon the ALJ's conclusion that Plaintiff's disability ended on July 1, 1997. The Plaintiff contends the ALJ's decision that Plaintiff's disability ended on July 1, 1997 is arbitrary, capricious, and unsupported by substantial evidence.

### A.  Personal Background

Plaintiff was 49 years old as of July 1, 1997, the date his disability benefits were terminated, and has a high school education.  (R. 338.)  Plaintiff last worked for six months of his trial work period from April 1994 to September 1994.  (R. 328.)

### B.  The Comparison Point Decision

The most recent favorable medical decision finding Plaintiff disabled was dated January 17, 1990 and was the result of a continuing medical review.  (R. 341.)  The

---

[13] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[14] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992)(holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[15] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

state agency examiner conducting the continuing medical review concluded Plaintiff's

disability, based on a primary diagnosis of recurrent depression, continued.  (*Id.*)

  C.  **Evidence Considered By ALJ Jones in Her Second Decision**

  The majority of the evidence considered by ALJ Jones consisted of Plaintiff's

medical records from his visits to several treating physicians and the mental status

assessments and reports completed by several consulting psychologists.

  Plaintiff visited the Clinton-Eaton-Ingham Community Health Board between

November 1987 and March 1988 for treatment of depression.  On his initial visit,

Plaintiff reported a history of psychiatric hospitalizations due to severe depressive

episodes stretching back at least twenty years.  (R. 165.)  The severity of his problem

was rated as 8 on a 9 point scale, with 8 constituting a very high measure of severity,

and Plaintiff was diagnosed with major depression, recurrent.  (R. 167-69.)  A final

assessment of Plaintiff's visits to the Clinton-Eaton-Ingham Community Health Board

between November 1987 and March 1988 reflected Plaintiff functioned fairly well from

an interpersonal standpoint, but his periods of severe depression limited his outside

social contacts.  (R. 163.)  The assessment also reflected Plaintiff had a history of

suicidal ideation and suicide attempts, as well as a tendency to "react to stress through

depressive episodes of a <u>very severe</u> nature."  (*Id.*)  Some improvement, however, in

his coping skills and ability to identify stressors and symptoms as a result of treatment

was noted.  (R. 164.)

  In January 1990, Plaintiff visited Dr. Pedro Ojeda, M.D., a psychiatrist, for a

consultative psychiatric examination.  (R. 155-60.)  Plaintiff reported a history of

depression dating back to the 1970's, three serious suicide attempts, and 10-15 psychiatric hospitalizations.  (R. 155.)  Dr. Ojeda diagnosed Plaintiff with recurrent depression, in partial remission, and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 65.[16]  (R. 160.)

Plaintiff was hospitalized in late December 1993 for chest pains and then was transferred to the psychiatric ward for treatment of his recurrent severe depression.  (R. 172.)  He reported poor sleep, anorexia, weight loss, hopelessness, and suicidal ideation.  (*Id.*)  He was diagnosed with dysthymia, a passive dependent personality disorder, and was assigned a GAF of 60.  (R. 179.)  With treatment, his mood became much brighter and he became more energetic and was discharged in a stable and improved condition.  (R. 172, 179.)

Medical evidence and evaluation close in time to the termination date of July 1, 1997 included a May 22, 1997, consultative psychological evaluation of Plaintiff performed by David M. Bortnick, Ph.D., Psy.D. (R. 216-18.)  Dr. Bortnick's thorough evaluation documents that Plaintiff displayed no behavioral signs of anxiety, depression, pain, distress, hallucinations, delusions, or cognitive impairment during the evaluation.  (R. 217.)  Dr. Bortnick wrote Plaintiff was "not psychotic or 'mentally ill' in any way" and "is not 'disabled' psychologically."  (*Id*.)  Dr. Bortnick stated Plaintiff has the ability to be paid for working and working might be therapeutic for Plaintiff.  (*Id.*)  Dr. Bortnick diagnosed the Plaintiff with depressive disorder by history, which he concluded was in partial remission, and nicotine dependence.  (R. 218.)  Notably, Dr. Bortnick

---

[16] GAF is a measure of an individual's psychological, social and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

concluded that Plaintiff can perform work or work-related activities without any psychological restrictions.  (*Id.*)

Consulting psychologist Dr. Val Bee, Psy.D. completed a Psychiatric Review Technique dated May 27, 1997.  (R. 281-89.)  Dr. Bee noted Plaintiff had not sought mental health treatment recently, his mental status was benign and he engaged in a wide variety of functional daily activities.  (R. 282.)  Although Plaintiff reported occasional depressive feelings and apathy, like Dr. Bortnick, Dr. Bee concluded Plaintiff's depression was in partial remission and "significant mental impairment or limitation is not evident at this time."  (R. 282, 284.)

On June 26, 1997 Dr. Mark T. Veldman performed a consultative examination. (R. 256-60.)  Dr. Veldman noted that Plaintiff had easy fatiguability and exhibited "multiple constitutional symptoms of anxiety including dizziness, headaches, nervousness, sleeplessness, memory loss, and poor coordination."  (R. 257.)

The record also includes progress notes from Norman Toth, D.O, a psychiatrist, at the Marion Citrus Mental Health Center from whom Plaintiff sought treatment in 1998 for depressive symptoms.  On Plaintiff's initial visit to Dr. Toth on January 23, 1998, Dr. Toth noted a history of chronic depression, which had worsened as of late.  (R. 247.) Plaintiff reported feeling quite a bit of stress recently as a result of his divorce from his second wife, the death of his father, losing his home, learning his son was gay, the cessation of his disability benefits, and poor treatment by his son and son's friends, who lived with him in a rented house.  (R. 247-48.)  Dr. Toth diagnosed Plaintiff with major depression, recurrent and moderate without psychotic features; chronic dysthymia; an organic mood disorder, depressed type; passive dependent personality traits; and a

11

GAF of 50.  (R. 249.)

Plaintiff made a return visit to Dr. Toth on February 20, 1998 and reported continued problems with his son and his son's friends, who were throwing out his mail and blocking his car in the driveway.  (R. 246.)  On March 20, 1998 Plaintiff reported feeling frustrated with his living situation, as his son refused to give Plaintiff his phone messages and had recently attempted to evict Plaintiff.  (R. 245.)  On April 27, 1998, Plaintiff's mood was depressed and his affect constricted.  (R. 244.)  On May 18, 1998, Plaintiff visited Sonal Parikh, M.D. at the Marion Citrus Mental Health Center on a follow-up appointment.  (R. 243.)  Dr. Parikh noted Plaintiff's mood was depressed with appropriate affect and diagnosed Plaintiff with major depression, recurrent, and dysthymia.  (*Id.*)

Allen Hodges, Ph.D., a consulting psychologist, completed a general clinical evaluation and neuropsychological screening of Plaintiff on June 25, 1998.  (R. 250-53.) Plaintiff's mood was depressed with a mildly blunt affect.  (R. 251.)  Plaintiff reported he suffered from auditory and visual hallucinations, particularly when he felt depressed. (R. 252.)  He reported the voices "tell him that life should end and that things will never be better" and stated his most recent suicide attempt six months before was due to these auditory hallucinations.  (R. 252.)  Dr. Hodges diagnosed Plaintiff with bipolar disorder based on recurrent major depressive episodes with hypomanic episodes, a personality disorder with borderline and dependent features, and noted Plaintiff's prognosis was guarded because it had existed for over 20 years.  (R. 252-53.)

On June 26, 1998, Plaintiff visited Lawrence Field, D.O., for a consultative disability examination.  (R. 254-55.)  Plaintiff reported having been depressed for over

25 years and Dr. Field opined Plaintiff's mental status was normal. (R. 255.)

Consulting psychologist Harry Bates, Ph.D. also completed a Psychiatric Review Technique dated July 31, 1998.  (R. 270-80.)  He concluded Plaintiff suffered from depression, but determined Plaintiff's depression did not constitute a severe impairment.  (R. 270, 273.)  He also noted Plaintiff's history as reported to Dr. Hodges contained exaggerations of Plaintiff's condition when compared to other evidence in the record and also conflicted with the history Plaintiff self-reported to Drs. Bortnick, Toth and Parikh.  (R. 280.)

In May 2001, Plaintiff was hospitalized for psychiatric treatment at the Marion Citrus Mental Health Center CSU for attempting suicide by overdosing on pills.  (R. 366-67, 374.)  He was discharged with prescriptions for Effexor and Carduria.  (R. 367.)

Consulting psychologist Rodney A. Poetter, Ph.D. performed a consultative mental status examination of Plaintiff and prepared a report dated August 1, 2001. (R. 373-75.)  Dr. Poetter noted Plaintiff "tended to explain his testing successes and his motivation during testing was questionable."  (R. 374.)  Dr. Poetter opined Plaintiff's mental status examination suggested a nonpsychotic depressive disorder and his symptoms were suggestive of a recurrent, severe major depressive disorder without psychotic features.  (R. 375.)

Consulting physician Robert G. Panzer, D.O. performed a consultative examination and prepared a report dated August 1, 2001.  (R. 376-79.)  He concluded Plaintiff's "mental health issues preclude him from holding any significant employment" and "due to his severe mental health issues he would be unable to hold a full-time job for any length of time."  (R. 379.)  Dr. Panzer further noted "[i]t is the opinion of this

13

provider that this patient is disabled secondary to his mental health issues." (*Id.*)

###    D.    Hearing Testimony

The majority of the hearing testimony the ALJ  relied upon in determining Plaintiff

was not under a disability as of July 1, 1997 took place at Plaintiff's second

supplemental hearing on July 15, 2004 before ALJ Jones.[17]

Plaintiff testified at that hearing.  When asked by ALJ Jones why he was unable

to work since 1997, Plaintiff stated he had tried doing so and it had not worked.  (R.

491.)  He specifically cited his inability to concentrate and said "I get confused about

things and just have a hard time doing what I'm told to do." (*Id.*)  He also testified to

having attempted suicide three times by overdosing on prescription drugs between

1997 and 2002.  (R. 493-94, 496.)  Plaintiff was hospitalized for one of those suicide

attempts for a period of two weeks at the Marion Citrus Mental Health Center.  (R. 501.)

Plaintiff testified he did not seek any mental health treatment between 1997 and 2002

because he had no transportation to take him to appointments and he had no way of

paying for any appointments.  (R. 501.)

When asked by his attorney why he could not successfully complete several trial

work periods during the early and late 1990's, Plaintiff stated "I just couldn't handle the

job" and "I just couldn't handle the stress that was involved in it."  (R. 495.)  He further

testified he was unable to concentrate, could not remember the instructions he was

---

[17] ALJ Jones conducted a third supplemental hearing on June 17, 2008 pursuant to a remand order from the Appeals Council, but the testimony at this third supplemental hearing revolved entirely around the issue of inconsistencies between the VE's testimony at the second supplemental hearing and the DICTIONARY OF OCCUPATIONAL TITLES.  Accordingly, Plaintiff did not offer any testimony regarding his symptoms, activities of daily living, etc. at the third supplemental hearing.  (R. 578-601.)  ALJ Jones thus referred to the testimony from the second supplemental hearing on those issues in her second written decision.

given and would become confused with which tasks to perform and in what order to perform them.  (R. 496.)

Edmund Bartlett, Ph.D., a clinical psychologist, testified as a medical expert at Plaintiff's second supplemental hearing.  (R. 503.)  Dr.  Bartlett testified Plaintiff was only moderately limited in (i) his ability to maintain concentration for extended periods of time, (ii) his ability to carry out detailed instructions, (iii) responding to changes in a workplace, (iv) setting goals independently of others, (v) his ability to relate to the public in social interactions, and (vi) his ability to maintain basic standards of neatness.  (R. 510-11.)  He testified Plaintiff did not medically meet or equal any of the Listings.  (*Id.*)  He also opined Plaintiff remained capable of doing simple and basic tasks to a reasonably productive standard in any kind of a home environment, but Plaintiff's ability to do so in a work environment would require employment with a fairly benign employer.  (R. 512.)  He also opined Plaintiff can take care of himself.  (*Id.*)

### E.   Findings of ALJ Jones in Her Second Written Decision

In her decision ALJ Jones noted Plaintiff, at the time of the CPD, had the medically determinable impairment of a depressive disorder, which "rendered Plaintiff incapable of performing the mental functions involved in unskilled work on a sustained basis."  (R. 327.)  ALJ Jones also found Plaintiff had not engaged in substantial gainful activity since July 1, 1997, the date Plaintiff's disability ended.  (R. 328.)

ALJ Jones concluded that the medical evidence established, as of July 1, 1997, Plaintiff had the medically determinable impairments of a depressive disorder, a personality disorder, and a seizure disorder, which was controlled with Tegretol.  (R.

328.)  She concluded since July 1, 1997 Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings.  (R. 329.)  She further concluded medical improvement had occurred as of July1, 1997. (R. 330.)  ALJ Jones further determined, as of July 1, 1997, the impairments present at the time of the CPD had decreased in medical severity to the point where Plaintiff had the RFC to lift and carry 25 pounds frequently and 50 pounds occasionally; stand and/or walk for 6 hours in an 8 hour day; sit for 6 hours in an 8 hour day and perform simple, repetitive tasks. (R. 333.)

ALJ Jones also determined Plaintiff's medical improvement was related to his ability to work because it resulted in an increase in his RFC.  (R. 333.)  She further noted Plaintiff had no past relevant work, as he had not performed any work at the substantial gainful level within the 15 years prior to July 1, 1997.  (R. 337.)  She then noted Plaintiff was a younger individual age 18-44 with a high school education who is able to communicate in English.  (R. 337-38.)  Considering his age, education, work experience and RFC based on the impairments present as of the July 1, 1997, she determined Plaintiff was able to perform a significant number of jobs in the national economy.  (R. 338.)  In support of this conclusion, ALJ Jones relied upon the testimony of a VE, who testified that an individual with Plaintiff's vocational profile could perform the positions of grocery bagger and bus cleaner and significant numbers of both jobs existed in the national economy.  (R. 338-39.)  Accordingly, ALJ Jones concluded, as of July 1, 1997, Plaintiff had been capable of making a successful adjustment to work existing in significant numbers in the national economy.  (R. 339.)  ALJ Jones thus concluded Plaintiff's disability ceased as of July 1, 1997.  (*Id*.)

16

## IV.  DISCUSSION

Plaintiff argues the ALJ's conclusion that Plaintiff's disability ended on July 1, 1997 is arbitrary, capricious, and unsupported by substantial evidence. Further, while not designated as separate issues, Plaintiff raises two related points in his brief: (i) whether ALJ Jones erred in determining Plaintiff did not meet the requirements of Listing 12.04 as of July 1, 1997; and (ii) whether the conclusion that Plaintiff experienced medical improvement as of July 1, 1997 was unsupported by substantial evidence in the record.

The Court will first address whether Plaintiff still met Listing 12.04 on July 1, 1997 because Listing 12.04 was the basis Plaintiff was awarded disability and because Listing 12.04 was the basis for the 2002 decision that Plaintiff was again disabled.

### A.     The ALJ Did Not Err In Determining Plaintiff No Longer Met The Requirements of Listing 12.04 as of July 1, 1997

In determining whether a claimant has "[met] a listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings. . . ."[18]  Pursuant to 20 C.F.R. 404.1525(c), the introductory portion of each Listing defines or explains key specific medical findings which may be required to establish a diagnosis or confirm the existence of the impairment in order to meet the Listing.  Listing 12.04 provides in relevant part that a claimant is disabled if the claimant has a sufficiently severe "disturbance of mood, accompanied by a full or partial manic or depressive

---

[18]  Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002).

syndrome."[19]  In order to meet Listing 12.04, a claimant must demonstrate he or she

has a depressive syndrome, manic syndrome or bipolar syndrome resulting in two of

the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in

maintaining social functioning; or 3. Marked difficulties in maintaining concentration,

persistence, or pace; or 4. Repeated episodes of decompensation, each of extended

duration."[20] Alternatively, the claimant can meet the Listing by showing he has a

"medically documented history of a chronic affective disorder of at least 2 years'

duration that has caused more than a minimal limitation of ability to do basic work

activities" or a "residual disease process that has resulted in such marginal adjustment

that even a minimal increase in mental demands or change in the environment would

be predicted to cause the individual to decompensate" or a "current history of 1 or more

years' inability to function outside a highly supportive living arrangement, with an

indication of continued need for such an arrangement."[21]

     In her second written decision the ALJ concluded that Plaintiff no longer met the

requirements of Listing 12.04.  (R. 330.)  The ALJ noted:

> As for the claimant's mental impairments, the evidence, discussed in
> detail below, fails to demonstrate that the claimant's mental impairments
> satisfied the criteria for ... more than moderate limitations in any of the
> broad areas of mental functioning: at most, his depression and personality
> disorder caused moderate restriction of activities of daily living; moderate
> difficulties in maintaining social functioning; moderate difficulties in
> maintaining concentration, persistence or pace; and one episode of
> decompensation of extended duration since the comparison point
> decision.  There is also no evidence which establishes the presence of the

---

[19] 20 C.F.R. § 404, Subpt. P, App. 1., Listing 12.04.

[20] *Id.*

[21] *Id.*

> C criteria.  During the period at issue, the evidence fails to establish that
> the claimant was unable to function outside of a highly supportive living
> arrangement, or that he was so marginally adjusted that even normal
> workplace stress would be expected to cause him to decompensate.
> There is no evidence of repeated episodes of decompensation of
> extended duration.  (R. 330.)

The ALJ's conclusion that Plaintiff did not meet the requirements of Listing 12.04 is supported by substantial evidence in the record.  For example, Dr. Edmund Bartlett, a medical expert who testified at the second supplemental hearing, was asked whether Plaintiff met any of the Listings. Dr. Bartlett testified that in is opinion the Plaintiff did not demonstrate the marked limitations in any of the relevant areas necessary to meet Listing 12.04.  (R. 510-11.)   Additionally, for similar reasons, non-examining consulting psychologists Dr. Val Bee and Dr. Henry Bates also concluded Plaintiff did not meet the requirements for Listing 12.04.  (R. 269-89.)

The ALJ's determination that Plaintiff did not meet Listing 12.04 was also supported by other evidence in the record demonstrating Plaintiff did not suffer from marked restrictions in the areas of (i) maintaining social functioning, (ii) maintaining concentration, persistence, or pace, or (iii) in his activities of daily living, and he did not suffer repeated episodes of decompensation of extended duration.  While Plaintiff testified at his second supplemental hearing that he suffered from concentration problems, Dr. Bortnick – who performed a consultative evaluation –  reported Plaintiff was able to "pay attention, concentrate, and remain task-oriented." Similarly, Dr. Poetter noted in this report that Plaintiff "performed medical control exercises without error and within allowable time limits, inconsistent with severe concentration deficits."  (R. 218, 374-75, 499.)

With respect to social functioning, Plaintiff reported to Dr. Poetter that he "gets along fairly well with others" and his "interests include relaxing and talking to others." Plaintiff reported to Dr. Bortnick that he had a female friend with whom he spent time and his son visited him on a daily basis.  (R. 218, 374.)

With regard to Plaintiff's activities of daily living, Plaintiff reported to Dr. Bortnick that he performed all self-care behavior, shopped, prepared and cooked his own meals, mowed his lawn, trimmed his hedges. Consistent with the information provided to Dr. Bortnick, Dr. Poetter noted Plaintiff performed all activities of daily living.  (*Id.*)  Plaintiff also only demonstrated a single episode of decompensation during the relevant period when a suicide attempt in 2001 resulted in a two week hospitalization.  (R. 366-67, 374.)

Accordingly, based upon the evidence of record, the determination by ALJ Jones that Plaintiff no longer met Listing 12.04 as of July 1, 1997 was supported by substantial evidence including the testimony of a medical expert who testified at Plaintiff's second supplemental hearing.

### B.   The ALJ Did Not Err in Determining Plaintiff Experienced Medical Improvement Related to His Ability to Work

The ALJ also concluded in her second written decision that Plaintiff had experienced medical improvement related to his ability to work.  Specifically, with respect to Plaintiff's mental health issues the ALJ found that:

> In summation, the evidence reveals that from the CPD through July 1, 1997, while the claimant had periods of increased depression in response to stressful circumstances, he stopped seeing his psychiatrist, had only one hospitalization, and was able to function mentally and socially to the extent that he could care for his own needs and manage his

own financial affairs.  Evidence covering the months following July 1997
reveals no further suicide attempts or inpatient psychiatric stays.  His
mood appears to have improved as his circumstances became better.  He
was physically capable of performing personal care tasks, household
chores, shopping, and yardwork.  (R. 333.)

In discussing Plaintiff's RFC, the ALJ also noted:

In terms of the claimant's alleged depression, the medical evidence
discussed above indicates that while the claimant continued to have
periods of increased depression during the relevant period, his symptoms
were tied into rather chaotic circumstances, but became more
manageable when circumstances improved and when he was in
treatment.  Despite stress and depression, he was able to care for himself
physically and financially, and he had only one inpatient hospitalization
which occurred at a point when marital, financial and work stressors all
converged."  (R. 325.)

The ALJ later noted "[t]he evidence from 1997 through 2002 does not suggest that the

claimant's condition deteriorated to the point where he would have been found disabled

prior to 2002, the onset date established based on his subsequent, 2002 application."

(R. 326.)

Plaintiff contends the ALJ's decision that he experienced medical improvement

as of July 1, 1997 is unsupported by substantial evidence and was arbitrary and

capricious.  According to Plaintiff, the medical evidence shows his impairments and

functional capacities between July 1, 1997 and October 31, 2002 were the same as his

functional capacities before July 1, 1997 and after November 1, 2002.  Plaintiff

summarizes by arguing that there is "little if any difference in the medical opinions of

Plaintiff JARREL's [sic] treating physicians, concerning Plaintiff's depressive disorder ...

in this matter over time."  (Doc. 17 p. 14.)

Contrary to Plaintiff's argument the record relied upon by the ALJ in reaching her

decision demonstrates a mental health picture of Plaintiff as of July 1, 1997 different

21

from the mental health picture of Plaintiff on the CPD. Further, the Plaintiff's mental health limitations as of 2002 –  when he filed another application –  are not relevant to the Court's determination in this case for the simple reason that the decision challenged by Plaintiff – and the decision reviewed by the Court in this case –  is the ALJ's decision that Plaintiff's disability terminated on July 1, 1997. The records of Plaintiff's treating psychiatrists as well as the reports by the various consulting psychologists support the ALJ's decision.

For example, ALJ Jones cited and discussed the progress notes from Plaintiff's treating mental health professionals in 1998, Dr. Sanil Parikh, M.D. and Norman Toth, D.O, in concluding Plaintiff experienced medical improvement. These records support the conclusion that Plaintiff's condition had improved.  While Plaintiff reported feeling depressed during his visits to the Marion Citrus Mental Health Center, his depressive symptoms appeared to improve as his living situation improved.  (R. 243-49.)  As the ALJ pointed out, Plaintiff reported to Dr. Toth on his initial visit that he felt quite a bit of stress as a result of a particularly stressful year in which he was divorced for the second time, lost his home, his father died, learned his son was gay and had his disability benefits terminated.  (R. 247-48.)  Plaintiff's living situation continued to be a significant issue, as he continued to report difficulties with his son and his son's friends over the course of the months he received treatment at the Marion Citrus Mental Health Center. (R. 245-48.) While these stressors impacted Plaintiff to some degree, the ALJ appropriately concluded that Plaintiff's depression appeared to be tied to his living situation as opposed to psychotic or other causes.

Moreover, the ALJ appropriately relied upon the opinions of the various consulting psychologists in determining Plaintiff had experienced medical improvement

22

related to his ability to work.  The opinion and evaluation performed by Dr. Bortnick –

very close in time to the July 1, 1997 termination date –  fully supports the ALJ's

determination that Plaintiff's mental health condition had improved. After performing an

extensive evaluation Dr. Bortnick concluded that Plaintiff was "not psychotic or 'mentally

ill' in any way" and "is not 'disabled' psychologically."  (R. 217.)  Dr. Bortnick concluded

that Plaintiff can perform work or work-related activities without any psychological

restrictions. Notably, Dr. Bortnick went even further and concluded that working might

be therapeutic for Plaintiff. (*Id.*)  The ALJ accepted this opinion, but based upon the

other evidence of record, discounted the portion of Dr. Bortnick's opinion that Plaintiff

could perform work without any psychological restrictions.  In her decision the ALJ took

into account the evidence that Plaintiff demonstrated some difficulties in concentration

and, accordingly, the ALJ limited Plaintiff to performing work involving simple tasks.  (R.

335.)

Further, in concluding that Plaintiff experienced medical improvement as of July

1, 1997 the ALJ also relied upon and cited the opinions of non-examining psychologists

Dr. Val Bee, Psy.D. and Henry Bates, Ph.D., both of whom concluded Plaintiff's

depression did not constitute a severe impairment. (R. 269-89.)

The ALJ also discussed the relevant medical records cited by Plaintiff in support

of his claim that his condition was unchanged during the period from 1997 to 2002.

Plaintiff points to the consultative examination by Robert Panzer, D.O., who concluded

Plaintiff was "disabled secondary to his mental health issues."  (R. 379.)  The ALJ,

however, correctly concluded that Dr. Panzer's opinion should be given very limited

weight because Dr. Panzer "is not a psychiatrist or psychologist and his opinion is

based not on objective test results but on the claimant's own report of his psychiatric

history and on his account of his then current symptoms and circumstances." (R. 337.)

Plaintiff also points to a consultative psychological evaluation performed by Dr. Allen Hodges, who concluded Plaintiff had bipolar disorder based on recurrent major depressive episodes with hypomanic episodes. (R. 252-53.) The ALJ gave very limited weight to his opinion because as consultative non-examining psychologist Henry Bates, Ph.D. pointed out, Plaintiff's history as reported to Dr. Hodges contained exaggerations of Plaintiff's condition and conflicted with the history Plaintiff self-reported to Drs. Bortnick, Toth and Parikh. (R. 280.) Even consulting psychologist Rodney Poetter, Ph.D., whose opinions Plaintiff also cites in support of his position, noted Plaintiff "tended to explain his testing successes and his motivation during testing was questionable." (R. 374.)

In sum, the Court concludes that ALJ Jones did not err in finding that Plaintiff experienced medical improvement related to his ability to work as of July 1, 1997. Accordingly, the ALJ's determination that Plaintiff's disability ended as of July 1, 1997 was supported by substantial evidence in the record – including the progress notes from Plaintiff's treating psychiatrists at the Marion Citrus Mental Health Center as well as the reports of the various examining and non-examining psychological consultants.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on August 30, 2011.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

24

## NOTICE TO THE PARTIES

Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.